**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**JOSE M. CHARRIEZ,**

     **Plaintiff,**

**vs.**                           **Case No. 4:11cv379-LC/CAS**

**MARK GARCIA,**

     **Defendant.**

_____/


**THIRD REPORT AND RECOMMENDATION[1]**

       After the dismissal of claims against Defendants Bannister and Stine, this case was remanded for further proceedings as to the pro se Plaintiff's claim against Defendant Garcia.  Doc. 50.  The parties engaged in discovery, docs. 51, 56-57, and at the conclusion of the discovery period, Defendant Garcia filed a motion for summary judgment.  Doc. 59.  Plaintiff was advised of his obligation to respond to the motion, doc. 61, and he responded in timely fashion.  Docs. 60, 63.

---

       [1] The first report and recommendation entered in this case concerned Plaintiff's motion for a restraining order, doc. 12, which was denied.  Docs. 16, 24.  The second report and recommendation dealt with the motion to dismiss filed by Defendants Bannister, Stine, and Garcia, doc. 39.  The motion, doc. 39, was granted as to the claims against Defendants Bannister and Stine, but denied in part as to the claim against Defendant Garcia.  Docs. 46, 50.

In addition to the pending summary judgment motion, doc. 59, Plaintiff filed a motion seeking to reinstate former Defendant Bannister in this case.[2]  Doc. 60. Plaintiff's motion was deemed to be a Rule 60 motion for relief from a judgment or order, *see* doc. 61, and Defendants (either Defendant Garcia or Bannister, or both) were directed to show cause why Plaintiff's motion should not be granted and Plaintiff permitted to submit a third amended complaint.  Defendant Garcia filed a response in opposition.  Doc. 62.  This Report and Recommendation addresses both motions.

**Allegations of the Complaint**

Plaintiff filed a second amended complaint on May 24, 2012, alleging due process and First Amendment claims against three Defendants.[3]  Doc. 34.  Plaintiff alleged that as a result of a monitored telephone call from another inmate, prison officials from the Department of Corrections learned that the inmate requested his mother to deposit money into Plaintiff's inmate bank account.  Doc. 34 at 5.  During the ensuing investigation,[4] Plaintiff alleged that Defendant Garcia "used intimidation and threats to gain entry into plaintiff's parents' residence" to interrogate them.  *Id.*  Plaintiff alleged that his parents spoke with Defendant Garcia because of their "mistaken

---

[2] Plaintiff's motion is an omnibus pleading, titled as Plaintiff's motion to reinstate Daniel Bannister, a response to Defendant Garcia's motion for summary judgment, and Plaintiff's own cross motion for summary judgment.  Doc. 60.

[3] All three Defendants filed a motion to dismiss Plaintiff's second amended complaint for failure to state a claim.  Doc. 39.  It was concluded that Plaintiff failed to state a claim against Defendants Bannister and Stine, and the motion to dismiss was granted as to those Defendants, but otherwise denied as to the claim against Defendant Garcia.  Docs. 46, 50.  Defendants' motion to dismiss on the basis of qualified immunity was also denied as to Defendant Garcia.  *See* doc. 46 at 15-16.

[4] While Plaintiff acknowledges there was an "investigation," he contends that he did not receive a disciplinary report or have a disciplinary hearing.

impression that Garcia was in some official capacity representing the Springhill Police Department or Hernando County Sheriff." *Id.* Defendant Garcia then allegedly persuaded the Institutional Classification Team (hereinafter ICT) to suspend Plaintiff's visitation privileges. *Id.* Plaintiff claimed that he was called before the ICT and informed by Assistant Warden Daniel Bannister that his visitation privileges had been suspended until further notice. *Id.* Plaintiff claimed the suspension was imposed without prior notice to him and without an opportunity to be heard. *Id.* Plaintiff alleged that he was only informed that his visitation privileges would be suspended for up to a year when Defendant Bannister denied Plaintiff's formal grievance. *Id.* at 5, 6.

**Procedural Issues**

As alleged in the second amended complaint, Plaintiff's claims against Defendants Bannister and Stine were based on the fact that they denied Plaintiff's grievances. *See* doc. 46 at 7-8. There were no allegations that either Defendant participated in the suspension of Plaintiff's visitation privileges, and no causal connection was shown between those Defendants and Defendant Garcia. Thus, the motion to dismiss was granted on March 25, 2013, and Defendants Bannister and Stine were dismissed from this case. Docs. 46, 50. After resolution of the motion to dismiss, an Initial Scheduling Order was entered, doc. 51, and discovery began on March 27, 2013, and concluded on August 7, 2013. Doc. 57.

Plaintiff's Rule 60 motion was filed on October 23, 2013, nearly two months after Defendant Garcia filed his motion for summary judgment, and suggests that Plaintiff learned from review of Defendant Garcia's supporting evidence that Defendant Bannister was connected to the suspension of visitation privileges. Doc. 60 at 1-2.

Defendant Garcia's evidence, in particular the Inspector General's Report, shows that Defendant Bannister was not merely the conveyor of the message that Plaintiff's visitation privileges were suspended but, instead, Defendant Bannister made or otherwise authorized the decision upon request of Defendant Garcia.  *See* doc. 59-4 at 7-8, 20-22; doc. 60 at 2; doc. 61 at 3.

In response to Plaintiff's motion, Defendant Garcia points out that the first time Plaintiff reviewed the Inspector General's Report was not when the summary judgment motion was filed on August 28, 2013, but, instead, on July 17, 2013.  Doc. 62 at 9; see also doc. 62, ex. A (doc. 62-1).  Nevertheless, Defendant Garcia argues that because qualified immunity is appropriately granted in his favor concerning these same events, Defendant Bannister is entitled to qualified immunity as well and should not be reinstated.  Doc. 62 at 9-10.

Pursuant to FED. R. CIV. P. 60(b), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:"

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).  Plaintiff's motion is based on reason two, that newly discovered evidence[5] presents a basis for the claim against Defendant Bannister.  Pursuant to Rule 60(c), such a motion must be made within "a year after the entry of the judgment or order . . . ."  Plaintiff's motion, doc. 60, was timely filed within one year.  Because it appears that resolution of the motion will depend on whether qualified immunity is appropriate, Defendant's motion for summary judgment will be considered first.

As noted above (see footnote 2), Plaintiff's Rule 60 motion was also titled as Plaintiff's response to Defendant Garcia's motion for summary judgment and Plaintiff's cross motion for summary judgment.  Doc. 60.  Defendant was directed to show cause why Plaintiff should not be permitted to submit a third amended complaint.  Doc. 61.  Defendant was not directed to respond to the motion as a summary judgment and it will not be considered as Plaintiffs motion for summary judgment, although titled as such, for several reasons.  First, Plaintiff's motion was filed on October 23, 2013, nearly two months beyond the August 28, 2013, deadline for filing such motions.  Plaintiff did not show good cause for filing the motion two months late, although Plaintiff did request leave to file "the document" out of time.[6]  Second, the motion does not comply with the requirement of N.D. Fla. Loc. R. 56.1(a), that a motion for summary judgment must "be accompanied by a separate, short and concise statement of the material facts as to

---

[5] Such evidence was obtained during the discovery period, prior to granting Defendant Bannister's dismissal, and it is doubtful such evidence could have been discovered prior to entry of the Initial Scheduling Order, doc. 51.

[6] Plaintiff stated only that he had "been unable to secure the assistance plaintiff needed to file this document until this past week and therefore moves that this document be accepted as timely filed in regard to any applicable courts rules or order."  Doc. 60 at 1.

which the moving party contends there is no genuine issue to be tried."  The rule specifically provides that "[f]ailure to submit such a statement constitutes grounds for denial of the motion."  N.D. Fla. Loc. R. 56.1(A).  Although Plaintiff filed a supplement arguing that his prior document should "satisfy Plaintiff's 'burden in opposing summary judgment' " and it also demonstrates that summary judgment should be granted in his favor, *see* doc. 63, it does not.  Plaintiff's motion does not contain the required statement of material facts and should only be construed as a Rule 60 motion and as Plaintiff's response to Defendant Garcia's summary judgment motion.

**Standard of Review**

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202

(1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

As noted above, Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily

locate and check the source."  The party opposing the motion is required to serve a

similar statement of material facts as to which the party contends there is a genuine

issue to be tried, using the same format.  Because Plaintiff did not submit a statement of

the material facts, the facts set forth in Defendant's statement will be deemed admitted

if supported by the record evidence.

**The Undisputed Rule 56 evidence**[7]

Between January 24, 2011, and April 25, 2011, an investigation was conducted

by the Office of the Inspector General, Florida Department of Corrections, regarding the

introduction of contraband, specifically marijuana, at Sumter Correctional Institution.

Ex. B at 2; Ex. C at 1.  At the time of the investigation, "illegal drugs were a significant

problem" at Sumter C.I.  Ex. B at 2.  It appears from the Investigation Case Summary

that the investigation began after receipt of an Inmate Request from an unidentified

inmate[8] who alleged that certain persons where "bringing drugs onto the compound and

selling them to other inmates."  Ex. C at 1.  Ultimately, the investigation was

"downgraded" on April 25, 2011, because "[n]o physical or documentary evidence was

developed during this investigation, which would substantiate" the reporting inmate's

allegations.  *Id.* at 3.

In the beginning, Plaintiff was not a subject of the investigation, but information

obtained during the course of the investigation indicated a connection between Plaintiff

---

[7] Plaintiff submitted only one exhibit as evidence, a two paragraph affidavit.
Doc. 60 at 10.  Thus all exhibits referenced are to those filed with Defendant's summary
judgment motion, doc. 59.

[8] The inmate informant's name and identifying information was redacted from the
Case Summary but was not unknown to persons involved in the investigation.  Ex. C.

and inmate Jose Feliciano.[9]  Ex. B at 2.  Senior Inspector Mark Garcia, the Defendant, monitored telephone calls between inmate Feliciano and his mother, Ana Feliciano, during which Feliciano requested that his mother deposit money into the inmate bank accounts of several other prisoners.  Ex. C at 5.  On May 4, 2010,[10] inmate Feliciano directed his mother to "transfer money via Western Union to Santa Charriez," the mother of Plaintiff.  Ex. B at 2; Ex. C at 5.  "Inmate Feliciano told his mother that if she did not transfer this money to Santa Charriez, inmate Feliciano would be transferred away from Sumter C.I."  Ex. B at 2.[11]  Because Garcia knew that inmate Feliciano's statement as to the need for the money "was false," he surmised that inmate Feliciano "was either paying for contraband activities or being extorted by an inmate relative of Santa Charriez."  *Id.*  Garcia "checked the Facility Access Secure Tracking database and discovered Santa Charriez was" the mother and a visitor of Plaintiff.  Ex. B at 2; Ex. C at 6.

On April 6, 2011, Garcia "conducted a sworn interview of inmate Feliciano's mother, Ana Feliciano."  Ex. B at 3; Ex. C at 6-7.  "Ana Feliciano stated that she made

---

[9] The reporting inmate advised that marijuana was given to Jose Feliciano and two others who, in turn, "distributed it throughout" the institution.  Ex. C at 4.  Inspector Hopewell participated in the investigation and determined that inmate Feliciano used his mother "to make payments into other inmate accounts in order to pay for his drug transactions."  *Id.* at 5.

[10] Because the investigation took place in 2011, and Defendant Garcia "monitored telephone conversations on the SECURUS database" between February 24, 2011, through April 21, 2011, it is not clear whether the conversations were in 2010 as reported, Ex. C at 5, or in 2011.

[11] On May 5, 2010, the day following that conversation, "Mrs. Feliciano confirmed she made the transfer [to Santa Charriez] and provided Inmate Feliciano with confirmation number 4368485391 . . . ."  Ex. C at 5-6.

deposits for her son and admitted transferring money via Western Union to" Plaintiff's mother.  Ex. B at 3; Ex. C at 7.  "Ana Feliciano admitted she knew something was wrong and said she warned her son to stay out of trouble."  Ex. B at 3.  "She denied knowing her son was involved in the drug trade" and said she would instruct her son to cooperate with the investigation.  *Id.*

On the following day, April 7, 2011, Garcia conducted a sworn interview of Plaintiff's mother, Santa Charriez.  *Id.*  Garcia knocked on the door, identifying himself to Plaintiff's mother when she answered the door, showing her his credentials, while wearing "a black state-issued polo shirt with [his] name, rank, and a State of Florida Law Enforcement Inspector badge embroidered on it."  Ex. B at 3.  Garcia's Law Enforcement Officer badge was also displayed on the right side of his waist next to his state-issued holster and firearm.  *Id.*  Plaintiff's mother agreed to provide a statement and told Garcia that she would also instruct her son to cooperate in the investigation.  *Id.*  Garcia provided Plaintiff's mother with a phone number where Plaintiff could contact Garcia to discuss the "matter in a manner that would allow [Plaintiff] to participate in the investigation without placing himself in danger from other inmates."  *Id.*

On April 9, 2011, inmate Feliciano called Garcia and admitted that he was involved in the drug trade at Sumter C.I.  Ex. B at 3; Ex. C at 7.  Inmate Feliciano "admitted he made a mistake by involving his mother in his 'business.' " Ex. C at 7.  Inmate Feliciano also told Garcia that he was scared because rumors were circulating at Sumter C.I. about Garcia's investigation.  Ex. B at 3-4; Ex. C at 7.  He told Garcia he did not want to cooperate in the investigation "unless he could be transferred to a facility

close to his place of residence." Ex. C at 7.  Garcia told inmate Feliciano that he should "check in for Protective Management if he was afraid for his life or safety."  *Id.*

The following day, April 10, 2011, Plaintiff told his mother during a tape-recorded conversation that he would not contact Garcia about the investigation and, moreover, Plaintiff told his mother to ignore Garcia's calls.  Ex. B at 4; Ex. C at 6.  Three days later, Garcia called Plaintiff's mother and she indicated that she told Plaintiff to cooperate in the investigation.  Ex. B at 4; Ex. C at 7.  Plaintiff's mother told Garcia that Plaintiff had said the money wired to her was payment for "shoes" Plaintiff sold to inmate Feliciano. *Id.*

On April 15, 2011, Plaintiff's mother spoke with Plaintiff on the telephone and, during the recorded conversation, again instructed Plaintiff to call Garcia.  Ex. B at 4; Ex. C at 6.  Plaintiff said he would not call Garcia and instructed his mother to tell Garcia that the financial transaction between her and Mrs. Feliciano was related to payment for some "boots" sold at Sumter C.I.  *Id.*  Plaintiff also advised his mother to contact an attorney and not have any other contact with Garcia.  *Id.*  Garcia states in his affidavit that he did not visit Plaintiff at Sumter C.I. "out of respect for his right to refuse to answer questions and the potential harm that could befall [Plaintiff] if he was seen talking to a prison inspector and labeled an informant."  Ex. B at 4.

The investigation led Garcia to conclude that Plaintiff "was involved in the introduction of contraband into Sumter Correctional Institution in violation of § 944.47, Florida Statutes and/or extortion in violation of § 836.05, Florida Statutes."  Ex. B at 4. Garcia did not believe, however, that there was "proof 'beyond a reasonable doubt'" to bring criminal charges against Plaintiff or other subjects of the investigation.  *Id.*  Garcia

decided that, in spite of the fact that "there was sufficient evidence" to write Plaintiff a disciplinary report for violating Rule 3-13, "Introduction of Any Contraband" or Rule 9-20, "Extortion or Attempted Extortion" or Rule 9-4, "Attempt, Conspiracy, or Solicitation to Commit Any Crime or Violation of the Rules of Prohibited Conduct," Garcia did not write Plaintiff a disciplinary report because it "would have made public the evidence and information developed during the investigation and jeopardized the integrity of [that] investigation or future investigations."  Ex. B at 4-5.  In addition, a disciplinary report could also have placed Plaintiff and/or inmate Feliciano "in danger from other inmates, who may have been involved in the drug trade at Sumter Correctional Institution, as a result of their perceived participation/cooperation in the investigation."  *Id.* at 5.  Garcia stated that activities such as the introduction of contraband or extortion of other inmates" compromises the safety and security of a correctional institution.  *Id.*

As a result of the investigation, Garcia sent a memorandum to the acting warden, Daniel Bannister, on the morning of April 15, 2011, and requested that [Plaintiff] and [inmate] Feliciano have their visiting privileges temporarily suspended, pending permanent revocation."  Ex. B at 5; *see also* Ex. C at 20.  The memorandum advised that intelligence gathered during "current IG Investigation #11-3-0449" revealed that the two inmates "may have involved their family members in the introduction of Contraband into Sumter C.I."  Ex. C at 20.  The memorandum requested that "someone from Classification inform the inmates that this [was] a temporary revocation by [Garcia's] authority."  *Id.*  Garcia believed that "a suspension of [Plaintiff's] visiting privileges would help to prevent [Plaintiff] from participating in the drug trade and/or extortion of other inmates at Sumter Correctional Institution."  Ex. B at 5-6.

On April 15, 2011, Plaintiff's visiting privileges were suspended indefinitely by the Institutional Classification Team [hereinafter "ICT"].  Ex. D.  The ICT Docket reveals that the Team consisted of a Chairman, Classification Supervisor, and the Chief of Security, whose signatures are not legible.  *Id.*

A memorandum was issued to Plaintiff on April 15, 2011, by Senior Classification Officer D. Oudshoff informing him "that the Institutional Classification Team [had] suspended [his] visitation privileges."  Ex. E.  The memorandum stated that his visitation privileges were suspended "until further notice; pending permanent revocation."  *Id.* The memorandum identified "IG Investigation #11-3-0449" and stated that the "ICT was held on 4-15-2011 and you were verbally notified."  *Id.*  Plaintiff submitted an affidavit stating that Exhibit E "is the first time that I have ever seen or received a copy of this document . . . ."  Doc. 60 at 10.

Plaintiff sent an Inmate Request to Classification on April 19, 2011, asking why his visitation rights were suspended on April 15, 2011.  Ex. F.  The response advised only that the issue was "currently under investigation."  *Id.*  Plaintiff then submitted an Informal Grievance on April 26, 2011, complaining that on April 15, 2011, the ICT notified him that his visitation privileges had been suspended and that when he asked why, he received only a "vague response" which deprived Plaintiff of his "due process right to challenge the reason for and length of [his] visitation privileges."  Ex. G.  The response to that Grievance advised Plaintiff that until the investigation was complete, there was no obligation to provide Plaintiff "with any additional information regarding [that] issue . . . ."  *Id.*

Plaintiff subsequently filed a Formal Grievance concerning the issue and claiming that "[r]elying on false information" to deny visitation was "a criminal offense."  Ex. H.  Garcia received a request from the grievance coordinator at Sumter C.I. asking him to provide a response to Plaintiff's Grievance.  Ex. B at 6.  On May 23, 2011, Garcia submitted a memorandum addressed to Plaintiff advising that Garcia had requested the temporary suspension of Plaintiff's visiting privileges, pending permanent revocation, which was done "For Cause."  Ex. I.  Garcia explained that the investigation revealed that plaintiff had "involved [his] elderly mother . . . in the collection of money from another inmate . . . as payment for Contraband Activities in which" Plaintiff was "involved with said inmate."  *Id.*  The memorandum detailed how inmate Feliciano instructed his mother to wire $85 to Plaintiff's mother via Western Union and Plaintiff's mother then deposited $70 into Plaintiff's inmate bank account.  *Id.*  The memorandum further explained that because Plaintiff caused his mother to violate the Visitor Rules of Conduct, her "visitation privileges may be suspended by the Warden or his Designee for up to one year."  *Id.*  The memorandum also explained that Plaintiff was "afforded the opportunity to contact [Garcia] and provide testimony disputing the findings" of Garcia's investigation, but Plaintiff twice refused that opportunity in monitored telephone conversations with his mother on April 10 and April 15, 2011.  *Id.*  The memorandum concluded by advising Plaintiff that the length of his visiting suspension would "be at the discretion of the Warden or his Designee, and" could last for up to one year.  *Id.*

Plaintiff then appealed to the Secretary's Office that there was no rule, statute, or procedure which "prohibits a free citizen from providing money to another free citizen."  Ex. K.  Plaintiff claimed that there was no evidence of any contraband activities.  *Id.*  the

appeal was denied on June 22, 2011, Ex. L, and Plaintiff then initiated this lawsuit on August 8, 2011.  Docs. 1-2.

Garcia had concluded that his investigative findings were accurate and the suspension of visiting privileges for Plaintiff and inmate Feliciano was appropriate because there had been "a 53% decrease in the amount of marijuana recovered at Sumter Correctional Institution following the visitation suspensions."  Ex. B at 7. "Specifically, in three and a half months from January 1, 2011, until [Plaintiff] and inmate Feliciano had their visiting privileges suspended on April 15, 2011; Narcotic K-9 Units recovered 148.5 grams of marijuana at Sumter Correctional Institution."  *Id.*  "Over the remaining eight and a half months of 2011, (after the visiting privileges of [Plaintiff] and inmate Feliciano were suspended), Narcotic K-9 units recovered only 69.7 grams of marijuana at Sumter Correctional Institution."  *Id.*

Plaintiff stated in his second amended complaint that his visitation privileges were reinstated as of May 11, 2012.  Doc. 34 at 6.  Thus, the total time Plaintiff's privileges were suspended was from April 15, 2011, until May 11, 2012.

**Analysis**

Plaintiff's claims in this case are that his visitation rights were suspended in violation of Plaintiff's substantive and procedural due process rights as guaranteed by the Fourteenth Amendment of the Constitution.  Doc. 34 at 10.  Defendants argue that Plaintiff was not entitled to due process with regard to a temporary suspension of his visitation privileges because he does not have a liberty interest in those privileges.  Doc. 59 at 10-11.  Further, Defendant Garcia contends that because the ICT suspended Plaintiff's visitation privileges and not Defendant Garcia, he was not required "to provide

Plaintiff with any process under these circumstances." *Id.* Defendant Garcia also

asserts that Plaintiff has no protected right to intimate association under the First

Amendment. *Id.* at 12-13.

While incarceration necessarily limits or even withdraws many privileges and

rights, prisoners retain those "rights that are not inconsistent with his status as a

prisoner or with the legitimate penological objectives of the corrections system." Jones

v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 3537-

38, 53 L.Ed.2d 629 (1977), *quoting* Pell v. Procunier, 417 U.S. 817, 922, 94 S.Ct. 2800,

2804, 41 L.Ed.2d 495 (1974) (stating that "challenges to prison restrictions that are

asserted to inhibit First Amendment interests must be analyzed in terms of the

legitimate policies and goals of the corrections system, to whose custody and care the

prisoner has been committed in accordance with due process of law."). For example,

while an inmate retains the First Amendment right of free speech, the right is limited and

"not protected if affording protection would be inconsistent with the inmate's 'status as a

prisoner or with the legitimate penological objectives of the corrections system.'" Smith

v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008)(holding that legitimate penological

interests provided sufficient reason to limit inmate speech), *quoting* Pell, 417 U.S. at

822, 94 S.Ct. at 2804.

The Due Process Clause of the Fourteenth Amendment prohibits state action

that deprives "any person of life, liberty, or property, without due process of law ." U.S.

Const. amend. XIV. While prisoners may "claim the protections of the Due Process

Clause," Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935

(1974), due process does not exist in a vacuum. Due process exists to protect a liberty

interest.  Thus, to proceed with his procedural due process challenge, Plaintiff must demonstrate that his injury "is within the scope of the Due Process Clause."  Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999)(holding that an inmate who has not been convicted of a sex crime "is entitled to due process before the state declares him to be a sex offender"), citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999). Plaintiff was not deprived of his life or property, and is "entitled to due process only if he was deprived of 'liberty' within the meaning of the Fourteenth Amendment."  Kirby, 195 F.3d at 1290.

Relying on cases from the Supreme Court, the Eleventh Circuit Court of Appeals noted there were essentially "two situations in which a prisoner can be further deprived of his liberty such that due process is required."  195 F.3d at 1290-91.  "The first is when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court."  Id. at 1291, citing Sandin, 515 U.S. at 484, and Vitek v. Jones, 445 U.S. 480, 492–93, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital).  "The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Id. at 1291, citing Sandin, 515 U.S. at 484, and Wolff v. McDonnell, supra.  The Court explained that the difference between the two situations is that in the first, "the liberty interest exists apart from the state; in the second, the liberty interest is created by the state."  Kirby, Id. at 1291, citing Bass, 170 F.3d at 1318.

An inmate does not have a liberty "interest in unfettered visitation" which is protected by the Due Process Clause.  Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (concluding that "[t]he denial of prison access to a particular visitor . . . is not independently protected by the Due Process Clause," nor is it a protected interest under Kentucky state law); Taylor v. White, No. 11-0377, 2012 WL 404588, at *3 (S.D. Ala. Jan. 10, 2012) (holding that six-month loss of visitation privileges was not "a liberty interest to which due process attaches, either under the Constitution or by the State's creation.").  It has been well established that "[a] convicted prisoner has no absolute constitutional right to visitation, such privilege being subject to the discretion of prison authorities, provided the visitation policies of the prison meet legitimate penological objectives."  Evans v. Johnson, 808 F.2d 1427, 1428 (11th Cir. 1987) (other citations omitted); *see also* Van Poyck v. Dugger, 779 F.Supp. 571 (M.D. Fla. 1991);[12] Caraballo-Sandoval v. Honsted, 35 F.3d 521, 525 (11th Cir. 1994) (holding that inmates do not have a protected liberty interest in visitation privileges).

Judicial notice is taken that the Rules of the Department of Corrections permit suspension of an inmate's visitation privileges regardless of whether disciplinary proceedings are also initiated.  Rule 33-601.731(1)(a) provides: "Suspension of an inmate's visiting privileges shall be considered by the ICT as a management tool independent of any disciplinary action taken pursuant to Rules 33-601.301 through 33-

---

[12] In deciding Van Poyck, the district court noted that an inmate had "no absolute right to visitation" but found under Hewitt v. Helms that the Florida rules "created a liberty interesting" concerning visitation.  Van Poyck was decided prior to Sandin and, thus, prior to the Supreme Court's abandonment of the Hewitt methodology and should be read only to support the well established principle that there is no right to visitation.

601.314, F.A.C." FLA. ADMIN. CODE R. 33-601.731(1)(a).  Furthermore, the Rule states that suspension of visitation privileges "shall be considered by the ICT as a management tool only when an inmate is found guilty of the following offenses" and included in the list of offenses is "[a]ny rule violation which occurred during visiting, is visiting-related conduct, or is reasonably connected to the visitation process;" and "[p]ossessing or passing money;" and "[p]ossessing or using unauthorized drugs . . . ." FLA. ADMIN. CODE R. 33-601.731(1)(b)1,12, 3.[13]  Plaintiff's one year suspension of his visitation privilege was based upon Defendant Garcia's conclusion that Plaintiff's actions were in violation of the Department's rules.  Defendant Garcia had sufficient basis upon which to bring a disciplinary charge against Plaintiff by virtue of the monitored phone calls, conversations with Plaintiff's mother, inmate Feliciano's mother, and inmate Feliciano, and payments made to other prisoner's accounts by inmate Feliciano's mother, but chose not to so as to protect future investigations.

"Running a prison is an inordinately difficult undertaking" and deference is given to prison authorities who are charged with the administration of the nation's prisons. Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (citations omitted); see also Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (noting "that prison officials must be accorded latitude in the

---

[13] Another provision of the Rule also provides that "[i]f an inmate is found guilty of an offense listed in paragraph (1)(b), the ICT shall suspend the inmate's visiting privileges for the length of time specified on Form NI1-102, Visiting Privileges Suspension Matrix . . . ." FLA. ADMIN. CODE R. 33-601.731(1)(d).  That provision did not, however, become effective until September of 2012, after the events at issue in this case.  Nevertheless, the Suspension Matrix permits suspension for up to 12 months for passing or attempting to pass money to an inmate (first offense), and may be suspended indefinitely for the commission of criminal activity (first offense).  Id.

administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations).  "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485, 115 S.Ct. at 2301 (holding that a prisoner did not have a liberty interest protecting him from imposition of 30 days punishment in segregated confinement).  The suspension of visitation privileges is an expected and permissible form of discipline as an inmate has "no absolute right to visitation." Van Poyck v. Dugger, 779 F. Supp. 571, 573 (M.D. Fla. 1991), *quoting* Evans v. Johnson, 808 F.2d 1427, 1428 (11th Cir. 1987), *citing* Lynott v. Henderson, 610 F.2d 340, 342 (5th Cir. 1980); McCray v. Sullivan, 509 F.2d 1332, 1334 (5th Cir.), *cert. denied*, 423 U.S. 859 (1975); *see also* Townsend v. Palmer, No. 5:12cv176, 2012 WL 2155296 at *3 (N.D. Fla. June 12, 2012) (finding inmate's complaint failed to demonstrate a constitutional violation in the denial of visitation); Johnson v. Brown, No. 05-0019, 2008 WL 490923 at *4-5 (S.D. Ala. Feb. 19, 2008) (quoting language from Sandin that "[a]n inmate's ability to visit, to shop, and to use the telephone is heavily restricted while in prison, as are most aspects of an inmate's life."); Walker v. Loman, No. 2:06cv896, 2006 WL 3327663 (M.D. Ala. Nov. 15, 2006) (90 day loss of visitation and telephone privileges was not atypical and significant deprivation under Sandin and, thus, not entitled to due process protection).

In Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162 (2003), the Supreme Court considered whether certain Michigan prison regulations violated the "due process mandate of the Fourteenth Amendment, or the First or Eighth Amendments as applicable to the States through the Fourteenth Amendment."  539 U.S. at 128, 123

S.Ct. at 2165-166.  One regulation provided that inmates "who commit multiple substance-abuse violations" were not permitted "to receive any visitors except attorneys and members of the clergy," although an inmate subject to that restriction could apply for reinstatement of visitation privileges after two years, subject to the warden's discretion.  *Id.* at 130, 123 S.Ct. at 2166.  Other restrictions on visitation were imposed in the regulations and a challenge was brought pursuant to § 1983 by the "prisoners, their friends, and their family members," alleging violations under the First, Eighth, and Fourteenth Amendments.  *Id.* at 129-30, 123 S.Ct. at 2166.  The Court concluded that the two-year restriction on visits for inmates with two substance-abuse violations "serve[d] the legitimate goal of deterring the use of drugs and alcohol within the prisons."  539 U.S. at 134, 123 S.Ct. at 2168.  Accordingly, the Court's opinion in Overton, considered alongside Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), stand for the basic proposition that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment."  Beard v. Banks, 548 U.S. 521, 528, 126 S.Ct. 2572, 2577 (2006).  The First Amendment is implicated when visitation privileges are withdrawn, and the Supreme Court noted the "importance of" such a right.  Beard, 548 U.S. at 533, 126 S.Ct. at 2580.

In this case, the undisputed evidence demonstrates that Plaintiff's visitation privilege was suspended for one year based on the investigation which revealed that Plaintiff was involved in the introduction of contraband or the extortion of money from another inmate.  The discretionary decision to suspend visitation was related to the legitimate need to ensure the safety and security of correctional institutions.  Regardless

of whether the decision rests on the shoulders of the Assistant Warden (former Defendant Bannister) or a prison inspector, deference should be afforded and that decision upheld.  Because the interest in visitation is not a protected right, there was no need for "prior notice" or the "opportunity to be heard" because due process was not implicated.  Summary judgment should be granted in favor of Defendant Garcia because there was no violation of Plaintiff's constitutional right to due process.

To the degree Plaintiff asserted that his right to freedom of association was violated without due process, the Supreme Court has found that the right to "freedom of association is among the rights least compatible with incarceration."  Overton v. Bazzetta, 539 U.S. 126, 131, 123 S.Ct. 2162, 2167 (2003), citing Jones, 433 U.S. at 125-26, 97 S.Ct. 2532; Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).  A prisoner's right to intimate association is not altogether terminated, nor is it always irrelevant in prisoner civil rights actions, but it may be validly limited by a legitimate penological interest.  Overton, 539 U.S. at 131, 123 S.Ct. at 2167.  The limitation on Plaintiff's right to association was pursuant to a legitimate penological interest in maintaining the safety and security of the institution by preventing the introduction of contraband and the possible extortion of an inmate by another inmate. Summary judgment should be granted in Defendant Garcia's favor on this claim as well.

Plaintiff also alleged a substantive due process claim.  "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)."  McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994).  A plaintiff faces "a high bar when attempting to establish a

substantive due process violation as 'conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense.'"  Maddox v. Stephens, 727 F.3d 1109, 1119 (11th Cir. 2013), *quoting* Waddell v. Hendry Cnty. Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003).  Plaintiff has not shown that his substantive due process rights were violated, nor has Plaintiff shown that any named Defendant acted arbitrarily or in a manner that shocks the conscience.  Summary judgment should be afforded Defendant Garcia on this claim as well.

**Rule 60 Motion**

Because it is concluded that Plaintiff's due process rights were not violated, the motion to reinstate Defendant Bannister should be denied.  It is immaterial whether Defendant Bannister or Garcia should be the official charged with suspending Plaintiff's visitation privileges because doing so was not unconstitutional.

**RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant Garcia's motion for summary judgment, doc. 59, be **GRANTED** and judgment entered in his favor on all claims.  It is further **RECOMMENDED** that Plaintiff's Rule 60 motion to reinstate his claims against Defendant Bannister, doc. 60, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 3, 2014.


 S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**